# EXHIBIT 1

IN THE DISTRICT COURT OF MARSHALL COUNTY, OKLAHOMA

FILED
WANDA PEARCE
FEB 23 2017
Time_____
Court Clerk of Marshall County
By_____Deputy

| | |
|---|---|
| Sagacity, Inc. on behalf of itself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Magnum Hunter Production, Inc.;<br>Prize Energy Resources, L.P.; and<br>Cimarex Energy Company of Colorado.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. CJ-17-18<br>)<br>)<br>)<br>)<br>)<br>) |

## CLASS ACTION PETITION

Plaintiffs bring this claim on behalf of themselves and the Class of all other persons similarly situated against Defendants and in support of these claims state as follows:

## NATURE OF THE ACTION

1. Plaintiffs and the Class bring claims based upon Defendants' underpayment by taking improper Midstream Service Cost deductions or non-payment of royalties on natural gas and/or constituents of the gas stream produced from wells in Oklahoma (essentially Processing Costs since Defendants have a corporate policy not to deduct or allow the deduction of the other Midstream Service Costs). This is Round 2 of a similar but smaller case settled class-wide in *Hitch Enterprises, Inc., et al. v. Cimarex Energy Co., et al.*, Case No. 5:11-cv-00013-W (W.D. Okla. Judge West).

## VENUE AND JURISDICTION

2. This Court has jurisdiction over Defendants in that their wrongful acts

1

occurred and caused damages to Plaintiff and Class members in this State.

3. Venue is proper in this Court for one or more of the following reasons: (i) many of the wells and royalties therefrom are located in this judicial district; (ii) Class members reside in this judicial district; and (iii) Defendants do substantial continuous business in this judicial district.

## PARTIES

4. Plaintiff Sagacity, Inc. is an Oklahoma corporation and has a royalty interest in the N. Eola FBU 25-2 (Collins McKee 2-17); Howard C 2-17; Howard A 2-17; Cassel WA A-1; Cassell D; Howard Unit B-1; Cassell C-1; Pease A 3-17; Eola North Fault Block Unit; Shirley 3; Howard D-2; Pease A 3-23; Howard D 3-17; Cassell C 2-7H; Eola North FBU 26-4 (Dutton 4-16); Cassell C 3-7; Howard D 4-17; and Howard D 5-18 in Garvin County, Oklahoma, and Madill North Sycamore Unit C-1; Madill North Sycamore Unit C G-7; Madill North Sycamore Unit B-1; Madill North Sycamore Unit B-2; Madill North Sycamore Unit B-3; Madill North Sycamore Unit A-2; Madill North Sycamore Unit A-3; Madill North Sycamore Unit B-4; Madill North Sycamore Unit A-5; Junkins Story Unit 1; Madill North Sycamore Unit B-5; Madill North Sycamore Unit C-3; Madill North Sycamore Unit A-4; Madill North Sycamore Unit C-5; and Madill North Sycamore Unit B-6 wells in Marshall County, Oklahoma. Prize and/or Magnum Hunter holds one or more of the leases, and CECOC operates one or more of these 32 wells.

5. Defendants are as follows:

   a. Cimarex Energy Co. of Colorado, Inc. ("CECOC") is a significant subsidiary of Cimarex Energy Co. CECOC is believed to be a citizen of Colorado

where its corporate headquarters are located and a citizen of Texas where it is incorporated, and is doing business in the State of Oklahoma. CECOC has designated an agent for service of process in Oklahoma and can be served with process at the office of its resident agent Corporation Service Company, 115 SW 89th Street, Oklahoma City, OK 73139-8511.

b.  Prize Energy Resources, L.P. ("Prize") is a wholly owned subsidiary of Cimarex Energy, and is a limited partnership with Prize Operating Co. as its general partner. Prize can be served by serving its general partner through its resident agent Corporation Service Company, 115 SW 89th Street, Oklahoma City, OK 73139-8511.

c.  Magnum Hunter Production Inc. ("Magnum Hunter") is believed to be a Texas company with its principal place of business in Colorado. Magnum Hunter can be served by serving its resident agent Corporation Service Company, 115 SW 89th Street, Oklahoma City, OK 73139-8511.

d.  CECOC, Prize, and Magnum Hunter will be collectively referred to as "Cimarex", "Cimarex Energy", or "Defendants."

6.  CECOC operates over 100 Oklahoma wells, including approximately 32 wells and units in which Plaintiff Sagacity Inc. holds a royalty interest. CECOC holds no Oklahoma leases, but operates all of the Oklahoma leases held by Prize and Magnum Hunter.

7.  Cimarex Energy uses "netback pricing" as the methodology to pay royalty owners, but does not deduct from royalties for Gathering, Compression, Dehydration, or

Treatment, or the fuel used for those activities, so it only deducts from royalties for Processing (and Plant Fuel) which includes TF&S for NGLs and the percentages of products retained by third party processors.[1]

8. The acts charged in this Petition as having been done by Defendants were authorized, ordered, or done by their officers, agents, affiliates, employees, or representatives while actively engaged in the conduct or management of Defendants' business or affairs, and within the scope of their employment or agency with Defendants.

## CLASS ACTION ALLEGATIONS

9. Plaintiffs bring this action individually and, pursuant to 12 O.S. Sec. 2023(a) and (b)(3), as representatives of a Class defined as follows:

> All royalty owners in Oklahoma wells operated or leased by Prize Energy Resources, L.P., Cimarex Energy Co. of Colorado, Inc., and/or Magnum Hunter Production Inc. that have produced gas or gas constituents (such as residue gas or natural gas liquids) from January 1, 2013 to January 1, 2017.
>
> Excluded from the Class are: (1) the Mineral Management Service (Indian tribes and the United States); (2) Defendants, their affiliates, and employees, officers and directors; (3) Any NYSE or NASDAQ listed company (and its subsidiaries) engaged in oil and gas exploration, gathering, processing, or marketing; (4) all royalty owners to the extent they have sued any of the Defendants for underpayment of royalties from January 1, 2013 to the present before this suit was filed; (5) all royalty owners that expressly authorized in their leases the deduction of processing costs from royalties, and (6) all royalty owners to the extent their wells are both subject to the class action settlement in *Chieftain v. QEP Energy*, Case No. 5:11-cv-00212-

---

[1] Because a prior putative class case has been filed against Cimarex Energy Company and Cimarex Energy Co. of Colorado to recover for FL&U and Plant Fuel deductions from royalties but only for leases that expressly state that royalty will be paid on gas used off the lease premises and/or in the manufacture of products, Plaintiff and the Class do not sue at this time in this case at all for FL&U or Plant Fuel, regardless of lease language or implied covenants. *See Reirdon v. Cimarex Energy Company and Cimarex Energy Co. of Colorado*, Case No. 16-cv-445-SPS (E.D. Okla.).

4

R and the well was subsequently acquired by Defendants or any of their affiliates.

10. The prior settlement in *Hitch v. Cimarex Energy Co.* releases Defendants and their affiliated entities before January 1, 2013.

11. The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. For instance, Defendants have operated over 400 wells producing gas in Oklahoma and many more in which they hold a working interest, with at least one, and usually more, royalty owners for each well. There are more than 5,000 royalty owners. While many royalty owners remain in Oklahoma, many others reside in numerous other states, and perhaps countries. Defendants have within their possession or control records that identify all persons to whom they have paid royalties from wells located within Oklahoma from January 1, 2013 to January 1, 2017.

12. The questions of fact or law common to Plaintiffs and the Class include, without limitation, one or more of the following:

(a) Whether Plaintiffs and the Class members are the beneficiaries of an implied duty to market obligating Defendants to place the gas (and its constituents) from Class Wells into Marketable Condition;

(b) Determining the point at which the gas (and its constituents) that Defendants produce becomes commercially marketable;

(i) Whether Marketable Condition for residue gas occurs at transmission pipeline quality as Plaintiffs contend or earlier; and,

(ii) Whether Marketable Condition for NGLs occurs at fractionation quality as Plaintiffs contend or earlier; and

(c) Whether Defendants deducted or allowed hired third parties to deduct (in cash or in kind) amounts for placing the gas (and its constituents) into

Marketable Condition before paying royalty to Plaintiffs and the Class members.

13. Plaintiffs are typical of other Class members because Defendants pay royalty to Plaintiffs and other Class members using a common method. Defendants pay royalty based on the net revenue Defendants receive under their marketing contracts. The marketing contract terms are unknown to and unapproved by royalty owners. The contracts are necessary to place the gas and its constituent parts into marketable condition. Plaintiffs are also typical of the other Class members because their leases do not contain an express provision authorizing deductions of Processing Costs (Fees, residue retained; NGLs retained or TF&S).

14. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs are royalty owners paid by Defendants, understand their duties as Class representatives, and their interests in recovering for improper deductions do not conflict with the recovery of improper deductions by the Class. Plaintiffs have retained counsel competent and experienced in class action and royalty owner litigation.

15. This action is properly maintainable as a class action. Common questions of law *or* fact exist as to all members of the Class and those common questions predominate over any questions solely affecting individual members of such Class. *See* ¶ 12 above. There is no need for individual Class members to testify in order to establish Defendants' liability or even damages to the Class.

16. Class action treatment is appropriate in this matter and is superior to the alternative of numerous individual lawsuits by members of the Class. Class action

treatment will allow a large number of similarly situated individuals to prosecute their common claims in a single forum, simultaneously, efficiently, and without duplication of time, expense and effort on the part of those individuals, witnesses, the courts and/or Defendants. Likewise, class action treatment will avoid the possibility of inconsistent and/or varying results in this matter arising out of the same facts. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action and no superior alternative forum exists for the fair and efficient adjudication of the claims of all Class members.

17. Class action treatment in this matter is further superior to the alternative of numerous individual lawsuits by the members of the Class because joinder of all members of those Class would be either highly impracticable or impossible and because the amounts at stake for individual Class members, while significant in the aggregate, are not great enough to enable them to enlist the assistance of competent legal counsel to pursue their claims individually. In the absence of a class action in this matter, Defendants will likely retain the benefit of their wrongdoing.

## GAS INDUSTRY BACKGROUND

18. The members of the Plaintiff Class own interests in wells that produce gas and constituent products that are subject to uniform accounting methods and to applicable implied marketable product law that require the lessee to bear all of the costs of placing the products, whether gas or its constituent parts, in "Marketable Condition."

19. The lessee under an oil and gas lease has the duty to produce marketable products, and the lessee alone bears the expense in making all products marketable.

20. Gas and its constituent parts are marketable only when in the physical condition to be bought and sold in a commercial marketplace, which for gas needing processing is after processing.

21. Only after a given product is marketable does a royalty owner have to pay its proportionate share of the reasonable costs to get a higher enhanced value or price for that particular product.

### The Lessor-Lessee Relationship

22. The lessor owns minerals, including oil and gas, and the lessee has the money, labor, and know-how to extract, condition, and market those minerals. The lessor and lessee enter into a lease that allows the lessee to take the minerals from the lessor's land. The usual revenue split from a well was 1/8th to the lessor (royalty owner) and 7/8ths to the lessee. As the risk of finding oil and gas has diminished over time, due to the prevalence of wells delineating the field, better seismic technology to find oil and gas, and drilling rigs becoming more efficient, royalty owners on more recent leases have received 3/16th or even 1/4th of the revenue The oil and gas companies through undisclosed internal accounting practices have tried to keep as much of the well revenue as possible. These accounting practices are at the heart of every oil and gas royalty owner case.

### Residue Gas and Natural Gas Liquids Production

23. The gas is gathered from each well, dehydrated and compressed, through gathering lines that are buried underground and cross many miles of land. The three primary well gas products--methane, natural gas liquids ("NGLs"), and helium--are further

processed at processing plants before being trucked or piped to the commercial market and on to the end-user. A diagram illustrating parts of this process is below:



**Wellhead (Basic Separation and Gas Measurement)**

24. Wells produce oil, gas, and a host of other products, such as water, helium, nitrogen, etc., all mixed together in the gas stream.[2] After the stream comes out of the ground, it enters the free water knockout (a/k/a three-phase separator) which separates the products by gravity, water at the bottom, oil in the middle, and gas going out the top. Due

---

[2] Hydrocarbons can vary in chemical makeup (from simple methane to complex octane) and in form (from a pure gaseous state to liquid condensate). The non-hydrocarbon makeup of the well-stream that includes natural gas can also include gases such as helium, sulfur, carbon dioxide, and nitrogen. This mixture of many gaseous elements and substances is often referred to as the "gas stream" or just "gas".

to the low technology, the separator is not expensive (the "separation cost"). The gaseous mixture (with helium, nitrogen, NGLs, and other gaseous substances) passes from the separator into the gas line.[3] The remaining fluid goes through the heater-treater where heat, gravity segregation, chemical additives and electric current break down the mixture more clearly into oil and water. The heater-treater is installed, maintained and takes fuel to operate (the "heater-treater cost"). The water is drained off and sent for salt water disposal. The oil that is separated at the wellhead is collected in a tank, usually trucked out and sold. [The payment of oil royalties is not at issue in this lawsuit.]

25.    Since the pressure of many wells has depleted over the decades of production, sometimes wellhead compressors have been installed to suction gas out of the well or just to move the gaseous mixture. These wellhead compressors are installed, maintained and use fuel (the "wellhead compression" or "vacuum compression" cost). The gaseous mixture produced from a single well cannot be processed economically, so the mixtures are 'gathered' together through gathering lines and the aggregate mixture is put through a processing plant.

### Gathering Lines (Dehydration, Compression, Condensate)

26.    As the gaseous mixture from each well enters the gathering line it is measured, both volume (in Mcf) and in quality (Btu content) (combined, "gas measurement" done in MMBtu). This is done in a meter run which must be constantly

---

[3] A minute portion of this raw or mixed gaseous product may be used on the leased land to heat the farm house pursuant to a free gas clause in the lease or sometimes sold to a small, limited local market with a finite demand to local irrigators near the wellhead. This limited local market accounts for less than 3% of a producer's gas production.

maintained to preserve accuracy (the "measurement cost"). Gathering pipelines are made of metal that could be corroded by any remaining water vapor (and other corrosive gases) in the gaseous mixture, so a glycol dehydrator is used to remove the water vapor ("dehydrator cost"). Of course, gas cannot move unless it is pressurized, so large gas compressors are installed to move the gas down the gathering line. The gas must be pressurized high enough to overcome the back-pressure in the line and friction. These compressors are expensive and require fuel to operate (together, "gathering or field compression fee" and/or "gathering fuel"). The gathering pipelines themselves cost money to lay and maintain ("gathering cost"). Gas condensate (gas condensed into liquid as it cools) is collected at points along the gathering lines as a result of cleaning or "pigging the line" ("Condensate" or "drip condensate"), and is captured for fractionation later.[4] Finally, gathering lines leak, especially as they age, resulting in lost and unaccounted for gas ("L&U").

### Natural Gas Processing

27.    Once the gas mixture is gathered from a sufficient number of wells (and often from multiple gathering systems), it enters the inlet of the processing plant. To process the gas into methane, and mixed NGLs, lessees, such as Defendants, use gas processing plants. Sometimes the processing plant is owned by an unrelated third party and sometimes it is owned in whole or in part by lessees. Sometimes other impurities in the mixture must be removed such as carbon dioxide, nitrogen, or sulfur (the "treatment cost").

---

[4]    Plaintiff and the Class do not sue for underpayment or non-payment for drip condensate at this time.

Methane gas (sometimes called "residue gas") must meet the quality standards for long-haul pipeline transmission set by the Federal Energy Regulatory Commission (FERC) which is called "pipeline quality gas". NGLs are used as a feedstock in the petrochemical and oil refining industries, and are worth more than methane. NGLs are separated from the gaseous mixture by cooling the mixture until the NGLs become separated. This cooling or Cryogenic recovery method usually takes place at temperatures lower than minus 150°F (the "Cryogenic or cooling process"). The mixture of NGLs is further moved down a liquids pipeline and processed by a fractionator for separation of the NGLs into their component parts ("T&F" or "fractionation"). This total processing system involves expensive equipment and requires fuel to operate (collectively, the "processing charge" and/or "plant fuel").

28. At the tailgate of the processing plant, at least two products emerge: (1) residue gas (or methane gas); and, (2) NGLs (usually a mixture of NGLs, known as "raw make" or "Y" grade). Neither are commercially marketable at that point.

## Marketable Condition for the Products

29. *Methane Gas.* Methane gas (or residue gas) is commercial quality (a/k/a "pipeline quality") at the tailgate of the processing plant only after it is further pressurized to enter the transmission line by a booster compressor (the "booster compression" cost).

30. *NGLs.* The raw mixture of NGLs at the tailgate of the processing plant is not commercially marketable. It must be fractionated into commercially marketable products—ethane, propane, butane, isobutane, natural gasoline, etc. Defendants improperly deduct, in computing royalty for NGLs, processing fees and/or other costs

(such as transportation and fractionation, T&F, sometimes called TF&S) needed to reach commercially marketable fractionated NGLs. Such deductions are improper.

## Sale of Products

31. To turn the gas products into money, the producer then sells the products. One would expect that such sales would occur in the commercial market place in an arm's length transactions. That, in fact, occurs, but lessees attempt to cover up and manipulate that fact by self-serving language in marketing contracts about title transfers or even by creating wholly owned affiliates to manufacture a fictitious "sale" before the gas reaches commercial quality for sale.

32. The "starting price" for gas products is most often established by the lessee through a "weighted average sales price" or an "index price." If Defendants have the market power to, over time, obtain above "index price" in its arm's length sales, then as an agent for the royalty owner, the royalty owner is entitled to this higher price over time as well.

## Different Ways Defendants Underpay Royalty Owners

33. Defendants underpay Plaintiffs and the Class in one or more of the following ways, without limitation:

(a) <u>Natural Gas Liquids (NGLs)</u>. Defendants: (i) fail to pay royalty for all of the NGLs produced (some is retained by the processor to pay for processing); (ii) deduct processing fees and expenses; (iii) and reduce payment by TF&S all before obtaining commercially marketable fractionated NGLs.

(b)  <u>Residue Gas.</u>  Defendants: (i) fail to pay royalty for all of the Residue produced (some is retained by the processor to pay for processing); and, (ii) deduct processing fees and expenses, all before obtaining commercially marketable Residue.

## COUNT I—BREACH OF LEASE

34. Plaintiffs and the Class incorporate by this reference the allegations in ¶¶ 1-33 and 39-49.

35. Plaintiffs and the Class (or their predecessors in title) entered into written, fully executed, oil and gas leases with Defendants (or their predecessors in title). [5] The attached lease(s) and Class leases include implied covenants requiring Defendants to place the gas and its constituent parts in "Marketable Condition" at Defendants' exclusive cost. The leases also place upon Defendants the obligation to properly account for and pay royalty interests to royalty owners under the implied mutual benefit rule.

36. At all material times, Plaintiffs and the Class have performed their terms and obligations under the leases.

37. Defendants breached the implied covenants of the leases by its actions and/or inactions.

38. As a result of Defendants' breaches, Plaintiffs and the Class have been damaged through underpayment of the actual amounts due.

---

[5] For Sagacity, Inc., there are a number of leases assigned from Samedan Oil Corp. to ARCO and then to Prize and/or Magnum Hunter, for the wells and Units operated by CECOC in Marshall County, Oklahoma. See **Exhibit A.**

## COUNT II—UNJUST ENRICHMENT

39. Plaintiffs and the Class incorporate by this reference the allegations in ¶¶ 1-38 and 43-49.

40. Defendants voluntarily assumed the duty to market gas and pay royalty to persons with whom Defendants have no lease but who are subject to a pooling order issued by the Oklahoma Corporation Commission ("OCC") which obligates Defendants to pay the proper amount of royalty to these "force pooled royalty owners."

41. Defendants' practice of underpaying royalty, as specifically described above, harms these force pooled royalty owners and unjustly enriches Defendants because they keep money that should otherwise have been paid to the force pooled royalty owners.

42. Plaintiffs plead unjust enrichment as to those force pooled royalty owners because they have no lease with Defendants and have no claim for breach of lease.

43. Plaintiffs do not seek disgorgement of Defendants' profits from wrongfully withheld royalty. Instead they seek the payment of money that should have been paid to the royalty owners under a lease (breach of lease claim) or under an OCC order (unjust enrichment claim.)

## COUNT III-BREACH OF FIDUCIARY DUTY

44. Plaintiffs and the Class members incorporate by this reference the allegations in ¶¶ 1-42.

45. Plaintiffs and the Class members have wells that have unitized under 52 O.S. §§ 287.1-287.15 and/or 52 O.S. § 87.1.

46. Defendants have a fiduciary duty as a result of the above mentioned statutes, the Oklahoma Corporation Commission (OCC) orders made pursuant to those statutes, and/or the unitization order and agreement with Plaintiffs and the Class members based on field-wide units or secondary recovery under 52 O.S. §§ 287.1-287.15 and also by the creation of drilling and spacing units under 52 O.S. § 87.1.

47. Defendants are the unit operator by appointment from the Oklahoma Corporation Commission for Plaintiffs' wells and the Class members.

48. Defendants breached their fiduciary duty to Plaintiffs and the Class members by failing to properly report, account for, and distribute gas proceeds to Plaintiffs and the Class members for their proportionate royalty share of gas production.

49. Defendants' conduct in breaching its fiduciary duties to Plaintiffs and the Class members was done intentionally, maliciously, or in reckless disregard for the rights of Plaintiffs and the Class members.

50. As a direct and proximate result of Defendants' breach of fiduciary duty, Plaintiffs and the Class members are entitled to recover actual damages from Defendants. Plaintiffs reserve the right to re-plead for punitive damages in the event such is warranted by the evidence.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for an Order and Judgment against Defendants as follows:

a. Certifying this action pursuant to 12 O.S. Sec. 2023 (a) and (b)(3) as a class action, appoint Plaintiffs as Class representatives, and Plaintiffs' Counsel as Class counsel with reasonable notice to be given to members of the Class;

b. Awarding Plaintiffs and the Class member's actual damages, including interest thereon, for Defendants' breach of lease, unjust enrichment, and breach of fiduciary duty;

c. Granting Plaintiffs and the Class the costs of prosecuting this action together with reasonable attorney's fees, expenses, and costs out of the recovery; and,

d. Granting such other relief as this Court may deem just, equitable and proper.

### JURY DEMAND

Plaintiffs and the Class demand trial by jury regarding all issues that can be tried to a jury under applicable law.

### ATTORNEYS' LIEN CLAIMED.

/s/ *signature*

Rex A. Sharp OBA#011990
Rex A. Sharp, PA
5301 W. 75th Street
Prairie Village, KS 66208
(913) 901-0505
(913) 901-0419 fax
rsharp@midwest-law.com

Plaintiff's Counsel

17