## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

SAGACITY, INC., on behalf of itself and   )
all others similarly situated,            )
                                          )
              Plaintiff,                     )
                                          )
              v.                             )       **Case No. CIV-17-101-GLJ**
                                          )
MAGNUM HUNTER PRODUCTION,                 )
INC.; PRIZE ENERGY RESOURCES,             )
LP; CIMAREX ENERGY COMPANY                )
OF COLORADO,                              )
                                          )
              Defendants.                    )

## <u>ORDER GRANTING MOTION TO CERTIFY CLASS</u>

This matter comes before the Court on motion by Plaintiff Sagacity, Inc. for class certification. As part of their response to this motion, Defendants have moved to strike certain evidence and allegations, as well as a newly disclosed expert. For the reasons set forth below, the Court finds that Plaintiff's Motion for Class Certification and Opening Brief in Support Thereof [Docket No. 45] is hereby GRANTED. Additionally, Defendants' Motion to Strike Class Allegations [Docket No. 62] is DENIED AS MOOT, while Defendants' Motion to Strike Inadmissible Class Certification Evidence and Brief in Support [Docket No. 61], and Defendants' Motion to Strike Plaintiff's Newly Disclosed Experts M. Phyllis Bourque and William G. Foster and Brief in Support [Docket No. 91] are hereby DENIED.

## BACKGROUND/PROCEDURAL HISTORY

Plaintiff Sagacity, Inc. ("Sagacity" or "Plaintiff") filed a class action petition in Oklahoma State Court in Marshall County, Case No. 17-CJ-18, on February 23, 2017, and Defendants removed it to this Court on March 21, 2017 [Docket Nos. 1-2]. Sagacity is an Oklahoma Corporation that owns oil and/or gas wells in Marshall County, Oklahoma, which is within the Eastern District of Oklahoma. Defendants Cimarex Energy Company of Colorado, Inc. ("Cimarex") and Magnum Hunter Production, Inc. ("Magnum Hunter") are Texas corporations with their principal place of business in Colorado. Defendant Prize Energy Resources, L.P. ("Prize") is organized under Delaware law, with its principal place of business likewise in Colorado. Cimarex operates 32 wells and units in which Sagacity holds a royalty interest, and while Cimarex holds no Oklahoma leases, it operates all of the Oklahoma leases held by Prize and Magnum Hunter. *See* Docket No. 24, pp. 2-3, ¶¶ 4-6.

Individually and pursuant to Fed. R. Civ. P. 23(a), Sagacity originally asserted it was acting as a representative of a class defined as:

> All royalty owners in Oklahoma wells operated or leased by Prize Energy Resources, L.P., Cimarex Energy Co. of Colorado, Inc., and/or Magnum Hunter Production, Inc. that have produced gas or gas constituents (such as residue gas or natural gas liquids) from January 1, 2013 to present.
>
> Excluded from the Class are: (1) the Mineral Management Service (Indian tribes and the United States); (2) Defendants, their affiliates, and employees, officers and directors; (3) Any NYSE or NASDAQ listed company (and its subsidiaries) engaged in oil and gas exploration, gathering, processing, or marketing; (4) all royalty owners to the extent they have sued any of the Defendants for underpayment of royalties from January 1, 2013 to the present before this suit was filed; and (5) all royalty owners that expressly authorized in their leases the deduction of process costs from royalties.

Docket No. 24, p. 4, ¶ 9.

On August 19, 2019, Sagacity filed Plaintiff's Motion for Class Certification and Opening Brief in Support Thereof [Docket No. 45], which sets out one cause of action for breach of the implied duty to market in the lease or Oklahoma Corporation Commission ("OCC") Force Pool Order issued after May 8, 2012 [Docket No. 24, p. 14, ¶¶ 34-39]. Following objections in Defendants' Response to the Motion, Plaintiff submitted a revised Class Definition in its reply:

> All last successors in interest to royalty owners in Oklahoma wells operated by Cimarex Energy Co. of Colorado, Inc. and leased by Magnum Hunter Production, Inc. and/or Prize Energy Resources, L.P. that have produced gas or gas constituents (such as residue gas or natural gas liquids) from January 1, 2013 to present.
>
> Excluded from the Class are:  (1) agencies, departments, or instrumentalities of the United States of America; (2) Defendants, their affiliates, and employees, officers and directors; (3) Any NYSE or NASDAQ listed company (and its subsidiaries) engaged in oil and gas exploration, gathering, processing, or marketing; (4) all royalty owners to the extent they have sued any of the Defendants for underpayment of royalties from January 1, 2013 to the present before this suit was filed; (5) all royalty owners that expressly authorized in their leases the deduction of process costs from royalties; and (6) all royalty owners to whom Defendants remitted pass-through payments on behalf of non-operating working interest owners.

Docket No. 85, pp. 10-11.[1]  After the Motion for Class Certification was fully briefed, U. S. Magistrate Judge Kimberly E. West held a Class Certification hearing in this case on September 29, 2020 [Docket Nos. 99, 101].  On July 14, 2023, this case was reassigned to the undersigned U.S. Magistrate Judge [Docket No. 115].

---

[1] The revised Class Definition was submitted in response to Defendant's objections to the original Class which has been adjusted to, *inter alia*, exclude the 53 non-operated wells in which Defendants Magnum Hunter and/or Prize own a very small working interest and exclude all royalty owners to whom Defendants remitted pass-through payments.  *See* Docket No. 85, pp. 10-11.

Also pending before the Court are Defendants' Motion to Strike Inadmissible Class Certification Evidence and Brief in Support [Docket No. 61], Defendants' Motion to Strike Class Allegations and Brief in Support Thereof [Docket No. 62], and Defendants' Motion to Strike Plaintiff's Newly Disclosed Experts M. Phyllis Bourque and William G. Foster and Brief in Support [Docket No. 91]. At the hearing, U.S. Magistrate Judge West found that Defendants' Motion to Strike Class Allegations [Docket No. 62] should be denied as moot, noting that it was subsumed under the class certification hearing itself. *See* Docket No. 101, pp. 115-116. Having no reason to disturb the ruling made at the Class Certification Hearing, the Court agrees and notes that Defendants' Motion to Strike Class Allegations and Brief in Support Thereof [Docket No. 62] is DENIED AS MOOT, as determined previously by the Court. The Court addresses the remaining motions in turn.

<u>Motion to Strike Barbara Frankland Declaration</u>. First, Defendants' Motion to Strike Inadmissible Class Certification Evidence and Brief in Support [Docket No. 61] is DENIED. Plaintiff's Exhibit 2, attached to the Motion for Class Certification, contained a declaration from attorney Barbara Frankland, along with a number of exhibits, including: (i) Sagacity's leases, (ii) a lease schedule, (iii) a lease summary, (iv) a manual lease schedule, and (v) a manual lease summary. *See* Docket No. 45, Ex. 2. Defendants seek to strike it.

Plaintiff is correct that "[t]he Court generally disfavors motions to strike, and it especially disfavors them in this instance." *Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 2016 WL 2344561, at *1 (D. Kan. May 4, 2016). "The district court's class certification order, while important, is also preliminary: 'An order that grants or

denies class certification may be altered or amended before final judgment.'" *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1004 (9th Cir. 2018) (quoting Fed. R. Civ. P. 23(c)(1)(C)). Furthermore, "[a] class certification hearing is not a hearing to decide the admissibility of evidence, but whether the case should proceed as a class under [R]ule 23; in that sense, it is more like a hearing under [R]ule 12(b)(6) or [R]ule 56 than one to determine admissibility under the rules of evidence." *Zuniga v. Bernalillo Cnty.*, 319 F.R.D. 640, 659 n.5 (D.N.M. 2016). Although the Tenth Circuit has provided no direct guidance, it appears that in class certification proceedings, "evidentiary rules need not be strictly applied at the class certification stage." *Ammons v. La-Z-Boy, Inc.*, 2008 WL 5142186, at *12 (D. Utah Dec. 5, 2008) (collecting cases).

It is noted that "'[a]t the summary judgment stage, evidence need not be submitted in a form that would be admissible at trial,' but 'the content or substance of the evidence must be admissible.'" *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 999-1000 (10th Cir. 2019) (quoting *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citations omitted); *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016); Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.")). However, the relationship between summary judgment and conditional certification are different in that motions for class certification often occur, as in this case, much earlier in a case and prior to completion of discovery. As such, "[r]equiring a plaintiff to present evidence in favor of conditional certification that meets the standards in Rule 56 fails to take into account that the plaintiff has not yet been afforded an opportunity, through discovery, to

test fully the factual basis for his case.  Second, motions for conditional certification, unlike motions for summary judgment, do not seek the final disposition of a case on the merits." *White v. MPW Indus. Servs., Inc.,* 236 F.R.D. 363, 368 (E.D. Tenn. 2006).  *See also Beltran v. InterExchange, Inc.*, 2018 WL 1509258, at *4 (D. Colo. Mar. 27, 2018) ("Certification decisions are generally made before the close of merits discovery, as is true in the instant case, so there is bound to be some evidentiary uncertainty.") (quotation omitted). Importantly, "[t]he requirement is that the party submitting the evidence show that it will be possible to put the information, the substance or content of the evidence, into an admissible form." *Tesone*, 942 F.3d at 999 n.15 (quotation omitted) (citing Fed. R. Civ. P. 56(c)(2) adv. comm. cmt. ("The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated.")).

Defendants contend Ms. Frankland's Exhibit 2, containing a declaration and the attendant exhibits, should be stricken because (i) she cannot serve as both advocate and witness, (ii) she cannot serve as an expert witness, (iii) her declaration impermissibly states legal opinions and arguments, and (iii) portions of her declaration are not based on her personal knowledge.  Plaintiff contends that a motion to strike is inappropriate at this stage of the case, and further notes that the preparation of the lease summary and manual lease summary were done in an effort to comply with the Tenth Circuit's instructions in *Naylor Farms, Inc. v. Chaparral Energy, LLC*, that a chart is "precisely what a plaintiff should do to establish commonality under these circumstances." 923 F.3d 779, 795 (10th Cir. 2019) (*Naylor Farms II*) (citing *Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1219 (10th Cir. 2013); *see also Rhea v. Apache Corp.*, 2021 WL 5507037,

at *3 (E.D. Okla. July 30, 2021) ("The Federal Rules of Evidence specifically contemplate the use of summaries and charts to prove the content of voluminous writings such as are involved here. As a result, there is nothing necessarily improper or deficient by reason of plaintiff's reliance on summary charts[.]") (citing Fed. R. Civ. P. 56(c)(4); Fed. R. Evid. 1006), *reconsideration denied*, 2021 WL 5507039 (E.D. Okla. Nov. 16, 2021).

Importantly, Defendants do not seriously challenge the substance of the lease summaries. The Court has the expertise to distinguish between legal conclusions and relevant factual information, and will not treat legal conclusions as established facts. Additionally, the documents provided by Ms. Frankland will aid the Court in efficiently assessing the relevant information at the class certification stage. *See Allbaugh v. California Field Ironworkers Pension Tr.,* 2014 WL 2112934, at *7 (D. Nev. May 20, 2014) ("The Court has sufficient experience ignoring the legal conclusions of counsel and not treating those conclusions as established facts. Ms. Kroll does have personal knowledge of the content of the documents produced by Defendants, and her representation that notices have not been produced in discovery is more efficient than filing and asking the Court to cull through 7,700 pages of discovery documents to demonstrate that same point. Plus, evidence considered for purposes of certification does not need to be admissible."); *In re Fibrogen Sec. Litig.*, 2023 WL 5600077, at *2 (N.D. Cal. Aug. 29, 2023) ("[T]he Court will disregard the argument and read the declaration for its factual content and authentication of the factual record.") (citing, *inter alia*, *Allbaugh*, 2014 WL 2112934, at *7 (finding that even if declaration included legal conclusions, "the proper remedy is not to disregard [the attorney's] declaration wholesale," as "[t]he [c]ourt has

sufficient experience ignoring the legal conclusions of counsel and not treating those conclusions as established facts."). Accordingly, Defendant's Motion to Strike Inadmissible Class Certification Evidence and Brief in Support [Docket No. 61], which pertains to Ms. Barbara Frankland's declaration, is denied. *See, e.g.*, *Larragoite v. Heitman Properties of New Mexico, LLC*, 2000 WL 36739574, at *4 (D.N.M. Sept. 15, 2000) ("In considering the motion for class certification, the Court took note of the nature of Plaintiff's supporting exhibits and the information contained within the exhibits and weighed them accordingly. Given that this case is in the early stage of litigation and the exhibits were submitted in support of a motion for class certification, the Court finds that Defendants' motions are not well taken at this time and will be denied.").

Motion to Strike Experts. Second, Defendants' Motion to Strike Plaintiff's Newly Disclosed Experts M. Phyllis Bourque and William G. Foster and Brief in Support [Docket No. 91] is DENIED. Again, the Court notes that motions to strike are generally disfavored. *Roderick*, 2016 WL 2344561, at *1 ("The Court generally disfavors motions to strike, and it especially disfavors them in this instance."). "The purpose of Rule 26(a)(2)'s expert disclosure requirements is to eliminate surprise and provide the opposing party with enough information regarding the expert's opinions and methodology to prepare efficiently for deposition, any pretrial motions and trial." *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1122 (D. Colo. 2006). "Rule 26(a)(2) also authorizes admission of rebuttal expert testimony." *Duncan Grp., LLC v. Cimarex Energy Co.*, 2023 WL 3269699, at *4 (W.D. Okla. Apr. 18, 2023) (citing Fed. R. Civ. P. 26(a)(2)(D)(ii)). "A party's expert disclosures must be made 'at the times and in the sequence that the court orders.'" *Id.* at *3 (quoting

Fed. R. Civ. P. 26(a)(2)(D)). This Court's Sixth Amended Scheduling Order [Docket No. 70] required submission of the Class Certification Reply, to be filed with any rebuttal evidence including rebuttal expert disclosure, by July 22, 2020. This deadline was met. *See* Docket No. 85.[2] Plaintiff identified two additional experts as "rebuttal experts" M. Phyllis Bourque, a petroleum engineer, and William G. Foster, an economist. *Id.* Defendants challenge Plaintiff's identification of these two experts in the Reply [Docket No. 85], contending that doing so is disfavored and "fundamentally unfair." But Plaintiff's designation of these experts was done "at the time[] and in the sequence that the court order[ed]," and such a timeliness challenge is unpersuasive.

"The Federal Rules specifically limit rebuttal expert testimony to evidence that is 'intended solely to contradict or rebut evidence *on the same subject matter* identified by another party' in its expert disclosures. *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 2020 WL 1164869, at *14 (D. Kan. Mar. 10, 2020) (quoting Fed. R. Civ. P. 26(a)(2)(D)(ii)). Furthermore, "[r]ebuttal expert reports are not the proper place for presenting new arguments," and they "cannot put forth their own theories; they must restrict their testimony to attacking the theories offered by the adversary's experts." *Spring Creek Expl. & Prod. Co., LLC v. Hess Bakken Inv. II, LLC*, 2016 WL 1597529, at *3 (D. Colo. Apr. 21, 2016) ("Rebuttal expert reports necessitate a showing of facts supporting the opposite conclusion of those at which the opposing party's experts arrived

---

[2] Plaintiff timely filed the Reply on July 22, 2020, which contained references to the rebuttal experts. That same day, Plaintiff filed a motion for leave to file certain exhibits under seal, which, due to the timing of the motion, was not granted until July 23, 2020. Docket Nos. 84, 86. Plaintiff filed the sealed exhibits July 23, 2020. Docket Nos. 87-90.

in their response reports.") (quotations omitted).  Put another way, "[a] court properly may admit rebuttal evidence on a topic when a party opens the door to [that] topic. But generally, courts will exclude use of a rebuttal expert to introduce evidence more properly a part of a party's case-in-chief, especially if the alleged rebuttal expert is used to introduce new legal theories.  *In re EpiPen*, 2020 WL 1164869, at *14 (quotations omitted).

Defendants further challenge the admission of these experts' opinions,[3] asserting that:  (1) their disclosure was improper and prejudicial because they did not get a chance to respond, and (2) their reports are not proper rebuttal evidence because their opinions go to the central issue as to when natural gas becomes a marketable product and whether such issue is susceptible of common evidence.  Defendants assert that their opinions should have been disclosed as part of the case-in-chief.  Furthermore, Defendants contend Bourque's opinion is intended to bolster and strengthen Plaintiff's previously-designated expert opinion from Daniel T. Reineke, and that Foster's opinions contain new theories and arguments related to marketability.  Defendants contend Ms. Bourque opines on four different non-rebuttal topics, and Mr. Reineke's own rebuttal report should be considered sufficient.  Additionally, Defendants argue that Foster's report "purports" to respond to Defendants' experts, but contains new theories and arguments that they believe should have been part of the case-in-chief.  For these reasons, Defendants request that both reports be stricken.  Plaintiff responds that the opinions are permissive rebuttals, which are both thorough and incorporate ongoing discovery, and theorizes that this motion (and the other

---

[3] Defendants are not challenging the experts' qualification under *Daubert v. Merrrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

two motions to strike) are attempts at circumventing page limitations and briefing protocols through the disfavored use of a motion to strike.  Plaintiff contends they relied on Ms. Bourque's opinion to address issues regarding how the class gas was prepared for market, but also to address arguments raised by Defendants that they had not had a chance to address.  Furthermore, Plaintiff contends they are not required to predict and anticipatorily rebut every argument raised by Defendant.

The Court finds Defendants' Motion to Strike these two rebuttal reports should be denied.  The two reports recite that their opinions are offered in rebuttal to the three experts proffered by Defendants in their response to Plaintiff's class certification motion.  Both reports cite Defendant's expert opinions and give reasons for disagreeing with their conclusions.  Given that these experts were provided at the class certification stage and the disfavored position of motions to strike, the Court finds they are useful to the thorough resolution of the issues raised and demonstrate a more developed view of the scope of the evidence to be presented at trial.

## I.      STANDARD FOR CLASS CERTIFICATION

"'The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Roderick*, 725 F.3d 1213, 1217 (10th Cir. 2013) (quoting *Wal–Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 348 (2011) (internal quotation omitted)).  Fed. R. Civ. P. 23(a) sets out four prerequisites for a class action:

(1) the class is so *numerous* that joinder of all members is impracticable [**numerosity**];
(2) there are questions of law or fact *common to the class* [**commonality**];
(3) the claims or defenses of the representative parties are *typical* of the claims or defenses of the class [**typicality**]; and

(4) the representative parties will fairly and *adequately protect* the interests of the class [**adequacy**].

*See also Kunneman Properties, LLC v. Marathon Oil Co.*, 2022 WL 1766925, at *9 (N.D. Okla. Mar. 31, 2022) (citing *CGC Holding Co. LLC v. Broad and Cassel*, 773 F.3d 1076, 1086 (10th Cir. 2014)) (emphasis added).   Additionally, "'[t]he party must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b).'" *Roderick*, 725 F.3d at 1217 (quoting *Comcast Corp. v. Behrend,* 569 U.S. 27, 33 (2013)).   Here, Sagacity seeks certification under Rule 23(b)(3), which additionally requires the Court "to find that: (1) 'questions of law or fact common to class members predominate over any questions affecting only individual members,' (**predominance**); and (2) 'a class action is superior to other available methods for fairly and efficiently adjudicating the controversy' (**superiority**)." *Id.*, 725 F.3d at 1217 (citing Fed. R. Civ. P. 23(b) (emphasis added)). "[M]atters pertinent to these [23(b)(3)] findings include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

A class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *General Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982).   The Tenth Circuit states that this is "more than a pleading standard," *Roderick*, 725 F.3d at 1219 (citation omitted), and has characterized

this as a "strict burden of proof," *Tabor v. Hilti*, 703 F.3d 1206, 1228 (10th Cir. 2013), that "demands a rigorous analysis." *Roderick*, 725 F.3d at 1219 (quotation omitted). However, "[a]lthough we have cautioned that a court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim,' Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-466 (2013) (quoting *Wal–Mart*, 564 U.S. at 351 (internal quotation marks omitted)); *see also Harper v. C.R. England, Inc.*, 746 Fed. Appx. 712, 721-22 (10th Cir. 2018) ("Brevity may be the soul of wit, but it isn't the soul of rigorous analysis. Such a short discussion of class certification . . . leaves us without a sufficient record to review."). Consideration of the merits is therefore permitted "only to the extent []that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 568 U.S. at 466; *see also DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1194 (10th Cir. 2010) ("While the court should not pass judgment on the merits of the case at the class certification stage, it must conduct its own rigorous analysis, to ensure Rule 23's requirements are met.") (quotation omitted). The Court thus proceeds to address with rigor the four factors in Rule 23(a), along with the two additional factors in Rule 23(b)(2), delving into the merits only as necessary when the merits are intertwined with the class-certification analysis.

"Plaintiff, of course, bears the burden of fulfilling all these requirements. When ruling on a class certification motion, the Court need not accept either party's representations, but must independently find the relevant facts by a preponderance of the evidence." *Hill v. Aspen Contracting, Inc.*, 2021 WL 2662296, at *2 (D.N.M. Feb. 22,

2021) (citing *Payne v. Tri-State CareFlight, LLC*, 328 F.R.D. 601, 620 (D.N.M. 2018)).

"Therefore, the Court will find facts for the purposes of class certification by the

preponderance of the evidence but will allow the parties to challenge these findings during

the subsequent merits stages of this case. This approach is analogous to preliminary

injunction practice, and many circuits have endorsed it.  In taking evidence on the question

of class certification, the Federal Rules of Evidence apply, albeit in a relaxed fashion." *Id.*

at *2 (citations omitted).

## II.   ANALYSIS

> Under Oklahoma law, lessees like [Defendants] are subject to an implied
> duty of marketability (IDM).  The IDM imposes upon lessees "a duty to
> provide a marketable product available to market." Consistent with this duty,
> lessees are generally precluded from passing along to royalty owners any
> costs the lessees incur in making a product marketable. And because "raw or
> unprocessed gas" must typically "undergo[ ] certain field processes"—such
> as gathering, compressing, dehydrating, transporting, and producing
> (GCDTP services)—to make the gas marketable, lessees generally bear the
> costs associated with performing such services.

*Naylor Farms II,* 923 F.3d at 783 (quoting *Mittelstaedt v. Santa Fe Minerals, Inc.*, 1998

OK 7, ¶¶ 12, 20-21, 954 P.2d 1203, 1205-1206, 1208).  Since the 1998 *Mittelstaedt*

decision from the Oklahoma Supreme Court, "Oklahoma law [has been] clear that a lessee

has an implied duty to obtain a 'marketable product,' including the cost of preparing the

gas for market and getting the gas to the place of sale in marketable form." *Pummill v.*

*Hancock Expl. LLC*, 2018 OK CIV APP 48, ¶ 26, 419 P.3d 1268, 1275 (citing *Wood v.*

*TXO Prod. Corp.,* 1992 OK 100, ¶¶ 9-12, 854 P.2d 880, 882-883)); *see also Strack v. Cont'l*

*Res., Inc.*, 2017 OK CIV APP 53, ¶ 30, 405 P.3d 131, 140 ("[U]nder Oklahoma law, lessees

have an implied duty of marketability, *i.e.*, the lessee must bear the full cost of any services

required to put gas in a marketable condition, except where a lease expressly allows deductions for the costs.") (citing *Chieftain Royalty Co. v. XTO Energy, Inc.*, 528 Fed. Appx. 938, 940 (10th Cir. 2013) (citing *Wood*, 1992 OK 100, ¶¶ 9-12, 854 P.2d at 882-883)).   In other words, "the lessee *may not* deduct from royalty payments the costs of gathering, transportation, compression, dehydration, or blending if those costs are required to create a marketable product, unless the lease provides otherwise."   *Id.* (citing *Mittelstaedt*, 1998 OK 7 at ¶¶ 20-22, 954 P.2d at 1208; *Wood*, 1992 OK 100 at ¶¶ 9-11, 854 P.2d at 882-883; *TXO Prod. Corp. v. State ex rel. Comm'nrs of the Land Office* ("*CLO*"), 1994 OK 131, ¶¶ 11-17, 903 P.2d at 261-263); *see also Chieftain*, 528 Fed. Appx. at 940 ("Under Oklahoma law, lessees have an implied duty of marketability (IDM). Absent lease language negating the IDM or permitting certain deductions, the lessee must bear the full cost of services undertaken to place gas in marketable condition, such as gathering, compression, dehydration, treatment, and processing ('GCDTP' services).") (citing *Wood,* 1992 OK 100, ¶ 11, 854 P.2d at 882-883; *Mittelstaedt,* 1998 OK 7, ¶ 22, 954 P.2d at 1208).   When examining *Mittelstaedt*, therefore, "two things are clear. First, when *unmarketable* gas undergoes GCDTP services for purposes of *transforming* the unmarketable gas into a marketable product, a lessee breaches the IDM by passing on to royalty owners the cost of performing those GCDTP services. Second, when *marketable* gas undergoes GCDTP services to *enhance* the value of gas that is already marketable, a lessee may, under certain circumstance, allocate the cost of those services to royalty owners without breaching the IDM." *Naylor Farms II*, 923 F.3d at 791 (citing *Mittelstaedt*, 1998 OK 7, ¶¶ 2, 29-30, 954 P.2d at 1205, 1210).

Sagacity contends that Defendants deduct royalties for Processing (but not gathering, compression, dehydration, or treatment, or the fuel used for those activities) for purposes of obtaining marketability, including fractionation ("T&F") for natural gas liquids (NGLs) and the percentages of products retained by third party processors. *Id.*, pp. 3-4, ¶ 7. Sagacity asserts that deducting these royalties constitutes a breach of an IDM arising under Oklahoma law. Certification here depends, in the broadest terms, on the marketability of the gas at issue in this case and when such gas was sold into the market.

The proposed amended class includes 524 wells, potentially involving royalty payments to over 3,000 royalty owners for their royalty interests in the Class Wells. The class allegations indicate that the common questions of fact or law include one or more of the following:

(a) Whether Plaintiff and the Class members are the beneficiaries of an implied duty to market obligating Defendants to place the gas (and its constituents) from Class Wells into Marketable Condition;

(b) Determining the point at which gas (and its constituents) that Defendants produce becomes commercially marketable;

    (i) Whether Marketable Condition for residue gas occurs at transmission pipeline quality as Plaintiff contends or earlier; and,

    (ii) Whether Marketable Condition for NGLs occurs at fractionation quality as Plaintiff contends or earlier; and

(c) Whether Defendants deducted or allowed hired third parties to deduct (in cash or in kind) amounts for placing the gas (and its constituents) into Marketable Condition before paying royalty to Plaintiff and the Class Members.

Docket No. 24, p. 5, ¶ 12. Sagacity therefore contends that Rule 23 class certification on its single breach of lease claim as to the implied duty to market should be granted. Defendants argue Plaintiff fails to satisfy Rule 23(a)'s requirements of commonality, typicality, and adequacy, as well as Rule 23(b)'s requirements for predominance and

-16-

superiority.  The Court considers each of the four Rule 23(a) requirements, as well as the two Rule 23(b)(3) requirements, to determine if certification is appropriate given the current legal landscape.  Although Defendants state in their briefing that they are challenging all but the "numerosity" factor, the arguments largely center on or are subsumed under the commonality/predominance factors, so the Court's focus is largely on those two factors, with particular attention paid to predominance.  *See, e.g.*, *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 609 (1997) ("Rule 23(a)(2)'s 'commonality' requirement is [generally] subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions.").

A.   *Rule 23(a)(1) - Numerosity*

"[T]here is no set formula to determine if the class is so numerous that it should be so certified."  *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006) (quotation omitted). Defendants do not challenge the numerosity requirement, but the Court nevertheless finds the numerosity prerequisite is met here, where there are over 2,000 leases at issue and potentially over 3,000 putative class members.  *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) ("Although the number of members in a proposed class is not determinative of whether joinder is impracticable, the size of the class in this case— 100 to 150 members—is within the range that generally satisfies the numerosity requirement.") (citing, *inter alia*, 1 Newberg on Class Actions § 3.05, at 3-25 (3d ed.1992) (suggesting that any class consisting of more than forty members "should raise a presumption that joinder is impracticable")).  *Cf. Shook v. El Paso Cnty.*, 386 F.3d 963,

972 (10th Cir. 2004) ("The district court erred by not specifically addressing the traditional Rule 23 factors in denying class certification.").

B.   *Rule 23(a)(3) - Typicality*

To certify a class action, "the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Typicality, commonality, and adequacy all "tend to merge" in serving "as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Wal-Mart*, 564 U.S. at 349 n.5.  "'[D]iffering fact situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based on the same legal or remedial theory.'"  *Colorado Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1216 (10th Cir. 2014) (quoting *Adamson v. Bowen,* 855 F.2d 668, 676 (10th Cir. 1988)).

Plaintiff contends that this factor is met because every Class Member would have the same legal theory, based on a breach of the IDM under Oklahoma law, and that the legal claims of the representative are "typical of the claims . . . of the class."  Rule 23(a)(3).  "[T]ypicality exists where, as here, all class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances." *Devaughn*, 594 F.3d at 1199.  Defendants contend that individual inquiries as to royalty payment obligations and damages precludes typicality.  Additionally, Defendants contend that questions as to when the gas from each Class Well becomes marketable likewise

precludes this factor, and that lease language variations regarding market value are fatal to calculating damages in one stroke.

As discussed more fully below, the Court finds that although the Class Representative and each potential Class Member, or individual leaseholder, has varying circumstances, they all have the same common legal theory, *i.e.* their interests are not "significantly antagonistic" to each other, and they are all "at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances." *Id.* at 1199 ("Due to the common risk of harm and the common underlying legal theory for asserting that risk, the district court acted within its discretion to find that typicality was satisfied."). Typicality is therefore satisfied here. *See also Hitch Enterprises, Inc. v. Key Production Co. Inc.*, Texas County, Okla., CJ-2017-01, p. 4, ¶ 10 (Aug. 13, 2020) ("Factually, the pleadings show that Plaintiff and the Class Members are pursuing the same legal theory for decision of processing costs from January 1, 2013 to the present and doing so under the same legal cause of action, breach of lease. Any factual differences about lease language, gas quality, or gas contracts raised by defendant do not change the legal theory or legal cause of action asserted and, thus, will not defeat typicality.") (*affirmed in* Case No. 119,052 (Okla. Civ. App. Dec. 30, 2022), cert. denied October 16, 2023).

### C. *Rule – 23(a)(4) - Adequacy of Representation*

"Determining adequacy of representation turns on two questions: (1) whether named plaintiffs and their counsel have any conflicts of interest with other class members and (2) whether named plaintiffs and their counsel will vigorously prosecute the action on behalf of the class." *In re Motor Fuel Temperature Sales Pracs. Litig.*, 292 F.R.D. 652,

671 (D. Kan. 2013) (citing *East Tex. Motor Freight Sys., Inc. v. Rodriguez,* 431 U.S. 395, 403 (1977)).  Plaintiff asserts there are no apparent conflicts between the potential class members and either the representative or the named Counsel.  Additionally, they assert they are qualified to prosecute the claims on behalf of Plaintiff and the proposed Class. The Court further notes that Counsel has represented a similar Class and been found adequate before.  *See, e.g.*, *Hitch*, Texas County, Okla., CJ-2017-01.  The Court is satisfied that Plaintiff and its counsel can "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  As (i) there is no apparent conflict, (ii) Plaintiff is both aware and capable of acting as a class representative, and (iii) Plaintiff's attorneys are qualified to prosecute these claims, adequacy is met.

### D.  Rule 23(a)(2) - Commonality

Under this factor, Plaintiff must demonstrate that the class claims "depend upon a common contention" that is "of such a nature that it is capable of classwide resolution," meaning "that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart*, 564 U.S. at 349-350.  The most important aspect of commonality is not "common questions," but "the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* at 350 (quotation omitted).  "[F]or purposes of Rule 23(a)(2), [e]ven a single common question will do."  *Id.* at 359 ("We consider dissimilarities not in order to determine (as Rule 23(b)(3) requires) whether common questions *predominate,* but in order to determine (as Rule 23(a)(2) requires) whether there *is* [e]ven a single [common] question.") (quotation omitted).  In further explanation, the Supreme Court has explained,

"[a]n individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quotations omitted). Important to this and every other factor, the Court again notes that "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 568 U.S. at 466.

Plaintiff identifies at least one common issue:  whether Defendant breached the IDM.   This one common question stems from and raises a number of additional, interrelated questions, including:  (i) whether the leases at issue in this case contain an IDM obligating them to process natural gas into marketable products, (ii) whether the leaseholders were indeed charged for the processing, and (iii) calculation of damages.  All of these questions center on and relate back to when the gas at issue in this case becomes marketable.  Plaintiff contends that none of the issues in this case will require individual class members to testify, but that all issues will be addressed in a "battle of the experts" following class certification.  Defendants acknowledge the universe of arguments, but contend that these questions are not susceptible of generalized proof or answers in "one stroke" as required in *Wal-Mart* because of the number of various lease clauses at issue and the varying types of treatment, including processing, required for each of the wells.

As stated above, "even a single common question will do." *Wal-Mart*, 564 U.S. at 359 (internal quotations omitted), so the Court finds the commonality factor is generally

-21-

established.  As previously noted, however, "Rule 23(a)(2)'s 'commonality' requirement is [generally] subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions." *Amchem*, 521 U.S. at 609.  The "commonality" factor—and the related arguments presented by Defendants—is thus more fully assessed below in the context of and in combination with the predominance factor.

### E.  Rule 23(b)(3) - Predominance

Under Rule 23(b)(3), a class action may be certified if "[1] the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members [**predominance**], and [2] that a class action is superior to other available methods [**superiority**][.]" (emphasis added).  "Rule 23(b)(3) includes a nonexhaustive list of factors pertinent to a court's close look at the predominance and superiority criteria," *Amchem*, 521 U.S. at 615, such that "matters pertinent to these findings" are:

(A)   the class members' interests in individually controlling the prosecution or defense of separate actions;
(B)   the extent and nature of any litigation concerning the controversy already begun by or against class members;
(C)   the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
(D)   the likely difficulties in managing a class action.

Rule 23(b)(3).

First, "[t]o satisfy Rule 23(b)(3), a plaintiff must show that common questions subject to generalized, classwide proof *predominate* over individual questions." *Naylor Farms II*, 923 F.3d at 789 (quotation omitted); *see also Tyson Foods*, 577 U.S. at 453.  The

-22-

predominance criterion is, while similar to the commonality discussion above, "even more demanding." *Amchem*, 521 U.S. at 623-624. "[P]redominance may be destroyed if individualized issues will overwhelm those questions common to the class[.]" *Roderick*, 725 F.3d at 1220. "Put differently, the predominance prong asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *In re SandRidge Energy, Inc. Sec. Litig.*, 2019 WL 4752268, at *6 (W.D. Okla. Sept. 30, 2019) (quotation omitted). "Thus, to determine whether a plaintiff can satisfy Rule 23(b)(3)'s predominance requirement, a court must first *characterize* the issues in the case as common or not, and then *weigh* which issues predominate." *Naylor Farms II*, 923 F.3d at 789 (quotation omitted). "Predominance is ordinarily satisfied when plaintiffs have alleged a common course of conduct by the defendant." *Hill v. Kaiser-Francis Oil Co.*, 2010 WL 2474051, at *6 (W.D. Okla. June 9, 2010), order corrected on reconsideration, 2010 WL 11451125 (W.D. Okla. Aug. 5, 2010) (correcting class definition). As discussed above, the Court characterizes the issues in this case as common; the remaining question is whether they predominate.

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). Because Plaintiff's claim asserts that the common (and predominant) issue is whether Defendant breached the IDM, the elements here are (i) duty, (ii) breach, and (iii) damages. *See Hitch*, Texas County, Okla., CJ-2017-01, pp. 6-7. Plaintiff contends they set forth a prima facie showing for each element. For each of these elements, Plaintiff asserts that no royalty members will testify

-23-

or present evidence, and the evidence will not vary from member to member but will be susceptible of general, classwide proof.  Defendants challenge each element, contending that each requires individualized proof.  The Court is mindful that "[t]he predominance analysis is a pragmatic one.  It is not a numerical test that identifies every issue in the suit as suitable for either common or individual treatment and determines whether common questions predominate by examining the resulting balance on the scale." 2 Newberg and Rubenstein on Class Actions § 4:51(5) (6th ed.)

**Duty.**  The duty must arise from the presence of the IDM in each of the leases at issue in this case.  "Absent lease language negating the IDM or permitting certain deductions, the lessee must bear the full cost of services undertaken to place gas in marketable condition, such as gathering, compression, dehydration, treatment, and processing ('GCDTP' services)."  *Chieftain*, 528 Fed. Appx. at 940 (citing *Mittelstaedt*, 1998 OK 7, ¶¶ 20-22, 954 P.2d at 1208.

Both Tenth Circuit and Oklahoma precedent instructs that the best way to evaluate the leases at this stage is to create a "class lease chart."  *Naylor Farms II,* 923 F.3d at 795 ("As the district court noted, Naylor Farms prepared a chart that 'categorized' the leases at issue 'by royalty[-]clause language.' And we have previously indicated that this is precisely what a plaintiff should do to establish commonality under these circumstances.") (citing *Roderick*, 725 F.3d at 1219 ("On remand, the Trust could, for example, create a chart classifying lease types, and although we express no opinion as to the merits, the district court could decide that no lease type negates the IDM.") (internal citations omitted)); *see also Rhea v. Apache Corp.*, 2021 WL 5507037, at *3 (E.D. Okla. July 30, 2021) ("The

-24-

Federal Rules of Evidence specifically contemplate the use of summaries and charts to prove the content of voluminous writings such as are involved here. As a result, there is nothing necessarily improper or deficient by reason of plaintiff's reliance on summary charts[.]") (citing Fed. R. Civ. P. 56(c)(4); Fed. R. Evid. 1006), *reconsideration denied*, 2021 WL 5507039 (E.D. Okla. Nov. 16, 2021); *Hitch*, CJ-2017-1, pp. 8-9 (noting Plaintiff prepared a "Lease Language Review" and citing *Naylor Farms II* favorably).   It is important that such summary captures *every lease* at issue, as failure to do so generally results in denial of a motion to certify.  *See, e.g.*, *Roderick*, 725 F.3d at 1219 (vacating class certification order in part because "there are roughly 430 leases [out of 650] which have yet to be examined by the Trust or the district court."); *Chieftain*, 528 Fed. Appx. at 942-943 (vacating class certification order in part because "approximately 13,568 leases [out of 14,300] have yet to be examined by XTO—let alone by Chieftain or the district court."); *Naylor Farms*, 2017 WL 187542, at *4 (W.D. Okla. Jan. 17, 2017) (*Naylor Farms I*) ("The plaintiff in *Apache* analyzed, or based her argument on the analysis of, leases involved in fourteen out of 1,200 sample wells.") (citing *Foster v. Apache Corp.*, 285 F.R.D. 632, 639, 642 (W.D. Okla. 2012)).   However, the class lease summary chart does not have to prove that the clauses are identical.  *See Naylor Farms I*, 2017 WL 187542, at *4 ("Language in the royalty clauses obviously does not have to be identical, otherwise a class could never be certified.").  The nature of any summary chart is not to demonstrate that all items are identical, but to show their relationships and similarities.   The same applies here; a summary lease chart is created so that the varying clauses can be compared and either confirmed or challenged as to whether the language of each contains the IDM.

Plaintiff examined the 2,602 leases and classified them by lease type. *See* Docket No. 48, Ex. 3 (labelled "Ex. 2-D").  In preparing the lease summary, Ms. Frankland gathered and prepared a series of exhibits.  The first exhibit contains a table of lease language decided in Oklahoma royalty cases.  *See* Docket No. 45, Ex. 6 (labelled "Ex. 2-B").  Plaintiff also submitted exhibits containing leases with Sagacity,[4] Docket No. 45, Ex. 5 (labelled "Ex. 2-A"), as well as an example of an "Express Deduction" lease, Docket No. 48, Ex. 2 (labelled "Ex. 2-C").  Plaintiff then created a schedule of all 2,602 leases, with information including, *inter alia*, the correlating Bates number and the "Royalty Clause Addendum Key Identifier," relevant to the summary ("Lease Schedule").[5]  Docket No. 48, Ex. 3 (labelled "Ex. 2-D").  Defendants contend this analysis is insufficient, in part, because Ms. Frankland's review does not contain an analysis of casinghead gas royalty clauses, or how the royalty obligations in the leases had been amended by § 287.1 unitization agreements.  In response to Defendants' arguments, Plaintiff undertook an additional analysis of the oil royalty clauses and asserts they do not negate the IDM, *see* Docket No. 85, Ex. 5, and further notes that Defendants provide no authority under the unitization agreements permitting them to deduct midstream service costs or otherwise negate the IDM.

---

[4] Defendant points out that Ms. Frankland's Ex. 2-A only discusses five of Sagacity's 8 leases. Plaintiff replies that all 8 leases are contained in the lease schedule and lease summary (Exs. 2-D and 2-E, and all 8 leases contain the IDM.
[5] Plaintiff also provided the Court with a disc containing a digital version of each lease, which the Court used to generally confirm the accuracy of the schedule.  Docket No. 85, Ex. 3 ("Ex-1-A" Disc).

Based on the Lease Schedule, Plaintiff then created the lease summary, which identified the Royalty Clause Addendum Key Identifier in numerical order, from the greatest number of clauses for each lease type to the least, as well as a reference to a lease example by Bates number, and the specific lease type/clause for each category.  Docket No. 48, Ex. 4 (labelled "Ex. 2-E").  Although Exhibits 2-D and 2-E are self-referencing, neither is directly correlated to 2-B, the table of lease language.  At the class certification hearing, Plaintiff provided a lease summary similar to 2-E, with some slight variations and the crucial addition of which Oklahoma cases were used to support the conclusion that the various clauses did or did not contain the IDM ("Lease Summary").[6]  In the Lease Summary, Plaintiff categorizes each Lease by type: (i) IDM lease, (ii) "Express Deduction" ("ED"), (iii) "Express No Deduction" ("END"), (iv) Federal Government, and (iii) illegible.  Docket No. 48, Ex. 4 (labelled "Ex. 2-E"; Hr'g Ex. A).  The Court reviewed each of the above-mentioned exhibits and the relevant case law for purposes of Rule 23, and finds that they are generally accurate and that, in particular, the Lease Summary submitted at the class certification hearing (Hr'g Ex. A) is *generally* accurate.  *See Chieftain*, 528 Fed. Appx. at 942 ("[T]he district court must address the lease language issue as it relates to Rule 23 *before* certifying the class.") (citing *Comcast,* 569 U.S. at 33-34 (citing *Wal–Mart,* 564 U.S. at 350-351)); *see also* Fed R. Civ. P. 23 advisory committee

---

[6] It is unclear why this final chart was not made part of the extensive briefing and exhibits submitted by Plaintiff originally, as it is *the* chart that connects the various information in a cohesive format.  Nor is it entirely clear that the chart was entered into evidence at the hearing. Nonetheless, inasmuch as it was referred to by Plaintiff at the hearing, and Defendants raised no objection, the Court considers it, and hereby refers to it as "Hr'g Ex. A."

notes, 2003 Amendments (explaining that Rule 23(c)(1)(C)'s provision for conditional class certification was deleted because "[a] court that is not satisfied that the requirements of Rule 23 have been met should refuse certification")).

Plaintiff identifies the relevant clause in each of the 2,602 leases, then deducts from that number for class certification 436 leases as "Express Deduction" and 76 leases involving the Federal Government.  Based on Hr'g Ex. A, Plaintiff contends the remaining 2,090 leases are class leases as they either contain the IDM (2,071) as supported by Oklahoma case law, are "Express No Deduction" leases (8), or are illegible (11). Organized in another way, the total assessment of leases looks something like this:

A.  2,090 Proposed Class Leases[7]
    a.  2,071 IDM Leases:
        i.  1,138 *Mittelstaedt* Leases
        ii.  226 *Wood* Leases
        iii.  378 *CLO* Leases
        iv.  245 *Pummill*/Parrish Leases
        v.  54 *Whisenant* Leases
        vi.  23 *Fankhouser* Leases
        vii.  7 "Flat" leases
    b.  11 illegible leases
    c.  8 Express No Deduction (END) Leases
B.  512 Proposed Excluded Leases:
    a.  436 Express Deduction (ED) Leases
    b.  76 Federal Government Leases

The Proposed Class Leases make up 80% of the total leases evaluated in this case.

And of the proposed class of 2,090 leases, Plaintiff asserts 83.3% (1,742) of those leases

---

[7] Plaintiff's Lease Summary submitted at the class certification hearing, Hr'g Ex A, tallied the numbers with slight variations.  There does not appear to be an error in the chart, so much as an error in the attached calculations *based* on the chart.  For example, Plaintiff represented that there were 1,132 *Mittelstaedt* class leases, but a review of the chart reveals 1,138 were categorized as such.

contain the IDM as decided by three Oklahoma Supreme Court cases:   *Mittelstaedt v. Santa Fe Minerals, Inc.*, 1998 OK 7, 954 P.2d 1203 ("*Mittelstaedt*"); *Wood v. TXO Prod. Corp.,* 1992 OK 100, 854 P.2d 880 ("*Wood*"); *TXO Prod. Corp. v. State ex rel. Comm'nrs of the Land Office*, 1994 OK 131, 903 P.2d 259 ("*CLO"*) (collectively, "the *Mittelstaedt* trilogy").   The language in these leases is not all identical, even in leases purportedly supported by the same case; however, "[l]anguage in the royalty clauses obviously does not have to be identical, otherwise a class could never be certified." *Naylor Farms I*, 2017 WL 187542, at *4, 5 ("[T]he Oklahoma Supreme Court has concluded the particular royalty clause language does not negate the IDM (or is consistent with the marketable product rule)[.]").   An additional 11.7% are "*Pummill*" leases, purported to contain the IDM.   Plaintiff contends these leases containing language related to "gross proceeds," or proceeds, also contain the IDM, as previously found by the Oklahoma Court of Civil appeals.   *Pummill*, 2018 OK CIV APP 48, ¶ 4, 419 P.3d at 1270 ("Neither party to this litigation contends the language difference [between a 'gross proceeds' royalty clause and a 'market price at the well' clause] in the royalty clauses makes a difference when determining the point at which gas produced under the leases is a 'marketable product.'"), cert. denied, Case No. 114,703 (May 21, 2018).   Having examined the lease language, Ex. 2-E, Hr'g Ex. A, and the relevant case law, the Court finds the *Mittelstaedt* trilogy leases, including *Wood* and *CLO*, as well as the *Pummill* leases, are sufficiently supported at this stage.

This leaves 5% of the proposed class leases for further discussion.   As to the 8 END leases, the Court reviewed the Lease Summary for language and confirmed that they

specifically prohibit deduction for processing and as such fall within the class. *See Hitch*, CJ-2017-01, p. 11 ("The royalty owners with END leases are within the Class.").

For leases containing language pertaining to raw gas, Plaintiff cites *Whisenant v. Strat Land*, 2018 OK CIV APP 65, 429 P.3d 703 (raw gas) (with additional citations to *Naylor Farms v. Anadarko OGC*, 2009 WL 8572026 (W.D. Okla. Aug. 29, 2009) and *Hill*, 2010 WL 2474051) to support a finding that these leases contain the IDM. While Plaintiff provides a full citation to these cases, as opposed to only providing a case number with no additional citations for the Court to review the opinions as Plaintiff did in *Naylor Farms I*, Plaintiff still points to no portion of any of these three cases supporting the argument that the clauses cross-referenced to these cases contain the IDM. Indeed, *Whisenant* suggests the opposite conclusion. *See* 429 P.3d at 709 & n.10 (noting it appeared to be a case-by-case, individualized question as to the relevant lease language) (citing *Chieftain*, 528 Fed. App. at 941).

The same lack of clarity applies where Plaintiff characterizes the 23 leases as "*Fankhouser* leases" as containing an IDM with lease language with royalties paid from "net proceeds" or "net amount" or "net proceeds" for "gas sold." While *Fankhouser* raises the possibility that the IDM applies with these leases, *Fankhouser v. XTO Energy, Inc.*, 2012 WL 601415 (W.D. Okla. Feb. 23, 2012) ("[D]efendant argues that the implied duty to market can be negated by lease language that requires royalties be paid on gas "at the well", "gas as such", "raw gas", "net proceeds" or "proceeds, less handling costs" of gas sold. This argument, however, ignores the fact that the cases in which the implied duty to market has been found had similar royalty clauses."), such a perspective is not uniform

even in the Western District of Oklahoma. *See Kunneman*, 2022 WL 1766925, at *7 ("At least one Oklahoma court has previously declined to overlook the potential legal ramifications of 'net proceeds' versus 'gross proceeds.'") (citing *Foster,* 282 F.R.D. at 559 n.16 ("[N]othing in Oklahoma law as it may presently be ascertained tells us that differences in lease language may so facilely be disregarded."). Accordingly, the 23 leases in the category of *Fankhouser* leases are excluded from the class.

Turning to the 7 "flat" leases (identified as clauses 1.38 (2 leases), 1.44 (1 lease), 1.46 (1 lease), 1.47 (1 lease), 1.51 (1 lease), 1.55 (1 lease)), Plaintiff does not provide supporting argument or case law for these 7 leases, and they are therefore excluded. *Cf. Naylor Farms I*, 2017 WL 187542, at *5 ("As for those cases, all plaintiffs provided was the civil case number, which is insufficient for the court to locate and review the orders pertaining to the royalty clauses."). Finally, the Court turns to the 11 "illegible" leases. Of those 11 leases, the Court has generally confirmed that 7 of them are generally categized as truly "illegible," as their leases and attendant terms are undiscernible to the human eye. Because the terms are not knowable, the Court excludes them as by their nature they would require individualized proof. As to the other 4 "illegible" clauses ("illegible-2" (containing 3 leases) and "illegible-3" (containing 1 lease)), Plaintiff cites, and the Court confirmed, that the royalty/addenda language is clearly legible. The two "illegible-2" leases appear to contain an END clause: "Exhibit A: 13. Lessor's royalty shall not bear any part of the cost or expense of production, separation, dehydration, compression, processing, treatment, storage, or marketing of the oil or gas produced from the leased premises or lands pooled therewith. Lessor's royalty interest shall only be subject to Lessor's pro rata share of

severance taxes/gross production taxes."  Hr'g Ex. A, "illegible-2."  The language for "illegible-3" is less clear, and neither Hr'g Ex. A nor Plaintiff's extensive briefing or arguments provide support for this clause's inclusion in the class.  Accordingly, only the two "illegible-2" clauses should remain in the class.

Defendants contend that the Lease Summary is inaccurate, but points to no inaccuracies in fact, such as an example where Plaintiff inaccurately reported the language contained in a specific lease.  Rather, their arguments center on the number of variations in the lease language and their contention that there is no uniform payment methodology.  Defendants correctly point out that there are approximately 70 different royalty clauses at issue in this case.  Again, however, "[l]anguage in the royalty clauses obviously does not have to be identical[.]"  *Naylor Farms I*, 2017 WL 187542, at *4.  Defendant nevertheless asserts that the *Naylor Farms* court only approved a class containing *Mittelstaedt* leases, but the Court actually approved leases in the *Mittelstaedt* trilogy, 2017 WL 187542, at *5 (excluding language from leases listed only as *Naylor Farms Inc. v. Anadarko OGC*, cited as No. 5:08-cv-00668-R (W.D. Okla. 2008) and *Hill v. Kaiser-Francis Oil Co.*, cited as No. 5:09-cv-000007-R (W.D. Okla. 2009)), because plaintiff in *Naylor Farms I* failed to provide sufficient information for the Court to review the orders pertaining to the royalty clauses).  In this case Plaintiff provides sufficient information for the Court to review the lease language not just pursuant to the *Mittelstaedt* trilogy, but also *Pummill*, *Whisenant*, and *Fankhouser* as well.

Notably, the Court agrees that the Express Deduction Leases should be, and are, excluded, both by their legal terms and by Exclusion 5 of the proposed Amended Class

Definition.[8]   The same applies as to the Federal Government Leases, both by law and by Exclusion 1 of the proposed Amended Class Definition.

According to the Oklahoma Court of Civil Appeals, if the language in the royalty clauses offered by Plaintiff for class certification "do not negate the IDM and are consistent with the marketable product rule . . . any remaining variations in lease language do not defeat commonality or predominance." *Hitch*, CJ-2017-1, pp. 12-13, ¶¶ 42, 44 ("The Class Leases will establish Defendant's duty to the royalty owners when the merits of the claims are considered."). The Court agrees with this persuasive authority, and finds Plaintiff thus appropriately meets its burden of showing, for Rule 23 purposes, that each of the proposed Class Leases contains the IDM and presents a common legal duty to the Class Members. *Naylor Farms II*, 923 F.3d at 796 ("Perhaps these 'facts' [regarding distinctions between the leases] will ultimately be relevant to the merits question of whether Chaparral *breached* the IDM. Perhaps not. Either way, we fail to see how they might be relevant to the question of whether, as a threshold matter, the class leases *contain* an IDM. And the chart was designed to aid the district court in answering the latter question, not the former one.") (citing *Roderick*, 725 F.3d at 1218).

Plaintiff thus raises a prima facie case for the duty element of this claim. Additionally, the construction of the leases at issue is a legal one, not a factual one, and will not be subject to individualized issues of proof although they will appropriately be considered as part of any summary judgment motion. In sum, the Court finds that the

---

[8] As in *Hitch*, however, if "these royalty owners also have non-ED leases, *i.e.*, END or IDM leases[,] they remain members of the Class for those leases." Case No. CJ-2017-01, p. 11, ¶ 34.

following 1,997 leases fall within the class:  (i) 1,138 *Mittelstaedt* leases, (ii) 226 *Wood* leases, (iii) 378 *CLO* leases, (iv) 245 *Pummill* leases, (v) 8 END Leases, and (vi) the 2 "illegible-2" leases.  The following 605 leases are excluded from the class:  (i) 436 ED leases, (ii) 76 Federal Government leases, (iii) 54 *Whisenant* leases, (iv) 23 *Fankhouser* leases, (v) 7 "Flat leases, and (vi) the remaining 9 "illegible" leases.  This is sufficient for the duty element at this stage.

**Breach.**  As in *Naylor Farms II*, to determine whether Defendants breached the implied duty of marketability, "a jury will have to determine when the gas at issue became marketable." *Naylor Farms II*, 923 F.3d at 791.  In other words, "the marketability question turns not on *whether* the gas undergoes GCDTP services, but on whether the gas undergoes GCDTP services '*to become marketable*.'" *Id.* at 792.  However, "[t]he question of where and when particular gas is marketable is not settled in Oklahoma.  In addition, there is no categorical rule with respect to when post-production costs may be considered for royalty valuation." *Strack*, 2017 OK CIV APP 53, ¶ 31, 405 P.3d at 140 (citing *Mittelstaedt*, 1998 OK 7, ¶ 2, 954 P.2d at 1205 ("in some cases a royalty interest may be burdened with post-production costs, and in other cases it may not")).  "Regardless of when the gas becomes marketable, however, it is clear that, under Oklahoma law, '[a]bsent lease language negating the IDM or permitting certain deductions, the lessee must bear the full cost of services undertaken to place gas in marketable condition.'"  *Kunneman*, 2022 WL 1766925, at *4 (quoting *Chieftain*, 528 Fed. Appx. at 940) (citing *Mittelstaedt*, 1998 OK 7, ¶ 18, 954 P.2d at 1208)); *Strack*, 2017 OK CIV APP 53, ¶ 30, 405 P.3d at 140 ("[U]nder Oklahoma law, lessees have an implied duty of marketability, *i.e.*, the lessee must bear the

full cost of any services required to put gas in a marketable condition, except where a lease expressly allows deductions for the costs."); *Whisenant*, 2018 OK CIV APP 65, ¶ 13, 429 P.3d 703, 708 (same, citing *Mittelstaedt*).

The foundation for determining whether the IDM applies is grounded in the lease terms, and the Court is mindful that the Oklahoma Supreme Court "has never been as interested in drawing a hard line on when gas is 'marketable' as it has been in assuring that royalty is paid according to the terms of the lease, and that royalty owners are not deprived of the best deal that a producer can make." *Pummill*, 2018 OK CIV APP 48, ¶ 41, 419 P.3d at 1279. "The key point of *Mittelstaedt*, in many ways, was its requirement that a lessee must demonstrate to a questioning royalty owner that the terms of a lease are being fulfilled." *Id.*, 2018 OK CIV APP 48, ¶ 42, 419 P.3d at 1279. The Oklahoma Supreme Court instructs that "the lessor must bear a proportionate share of such costs *if the lessee can show* (1) that the costs enhanced the value of an already marketable product, (2) that such costs are reasonable, and (3) that actual royalty revenues increased in proportion with the costs assessed against the nonworking interest." *Mittelstaedt*, 1998 OK 7, ¶¶ 2, 30, 954 P.2d at 1205, 1210 (Indeed, "a royalty interest may bear post-production costs of transporting, blending, compression, and dehydration, when the costs are reasonable, when actual royalty revenues increase in proportion to the costs assessed against the royalty interest, when the costs are associated with transforming an already marketable product into an enhanced product, and when the lessee meets its burden of showing these facts.") (emphasis added).

Although the Oklahoma Court of Civil Appeals found in *Strack* that a "highly individualized and fact-intensive review of each Class Members' claim would be necessary to determine if Continental underpaid oil or gas royalties," 2017 OK CIV APP 53, ¶¶ 32, 405 P.3d at 140, the Tenth Circuit noted in *Naylor Farms II* that "the *Whisenant* court necessarily 'left . . . open' the possibility that, *in some cases*, a factfinder may be able to determine when gas became marketable without undertaking an individualized inquiry into the quality of that gas." *Naylor Farms II*, 923 F.3d at 795 (citing *Whisenant*, 2018 OK CIV APP 65, ¶ 14, 429 P.3d at 708.

In *Naylor Farms II*, the Tenth Circuit upheld the Northern District of Oklahoma's decision to certify a class, finding that the Plaintiff there had presented *classwide* evidence in support of two specific factors on the issue of marketability:

> First, the record contains classwide evidence indicating that Chaparral, like the defendants in *Pummill*, elects to participate in the high-pressure-pipeline market: according to Naylor Farms' expert, this is where Chaparral's gas is actually 'sold.' Second, Naylor Farms' expert opined that, as a classwide matter, the gas at issue here—like the gas at issue in *Pummill*—was required to undergo at least one GCDTP service before it could "reach" and be "sold into" the pipeline market.

*Naylor Farms II*, 923 F.3d at 793-794 ("[T]he [Oklahoma Court of Civil Appeals ("OCOCA")] pointed out that the first '*actual sale*' of the gas occurred not when the defendants transferred the gas to a midstream processing company, but instead 'at the 'tailgate' of the [processing] plants, where [the gas was] transferred into high-pressure lines.' And the OCOCA deduced from the location of this first '*actual sale*' that 'the market in which' the defendants 'chose[] to participate' was the pipeline market, not the wellhead market. Second, the OCOCA noted that the gas had to undergo GCDTP services to make

it 'acceptable for delivery' into the high-pressure pipelines.") (quoting *Pummill*, 2018 OK CIV APP 48, ¶¶ 37, 38, 410 P.3d at 1277-1278) (citing *Wood*, 1992 OK 100, ¶ 9, 854 P.2d at 882 (explaining that IDM imposes "a duty to get the product *to the place of sale* in marketable form" (emphasis added)).  A similar class certification was recently upheld by the Oklahoma Court of Civil Appeals and affirmed by the Oklahoma Supreme Court, through denial of certiorari, in taking this same approach.  *See Hitch*, CJ-2017-01, p. 18, ¶¶ 60-61 ("First, Hitch presented classwide evidence indicating that Kay, like the Defendants in *Pummill*, elects to participate in the high-pressure-pipeline market. . . . Second, Hitch's expert opines that, as a classwide matter, the gas at issue here—like the gas at issue in *Pummill*—was required to undergo GDCTP services to make it acceptable for delivery into the pipeline market."), affirmed in *Hitch*, OCOCA Case No. 119, 052, pp. 30-31, ¶¶ 47-48 ("The weight of the evidence in this record shows that individualized gas-quality analysis at the wellhead is not necessary to resolve the marketability issue because Key gathered and commingled all of the gas produced from the Class wells, including gas it contends was marketable at the wellhead, before it was delivered to the midstream companies for processing.  As a result, whatever processing the midstream companies did, they did the same processing on the commingled gas regardless of the unique characteristics of the gas extracted from any individual Class well."), underline cert. denied Oct. 16, 2023.

As the Tenth Circuit did in *Naylor Farms II*, and the Oklahoma Court of Civil Appeals did more recently in *Hitch*, this Court relies on both *Pummill* **and** *Whisenant* and will "disregard neither—in predicting how the [Oklahoma Supreme Court] would answer

the marketability question before us in this appeal." *Naylor Farms II*, 923 F.3d at 795 (internal quotations omitted) (predicting that the Oklahoma Supreme Court would hold "that, under the facts of this case, a jury could determine when the gas at issue became marketable without individually assessing the quality of that gas; instead, a jury could make this determination based solely on expert testimony that all the gas at issue was required to undergo at least one GCDTP service before it could 'reach' and be 'sold into' the pipeline market.") (citing *Whisenant*, 2018 OK CIV APP 65, ¶ 14, 429 P.3d at 708 (opining that the Oklahoma Supreme Court has intentionally and wisely "left the issue [of marketability] open to resolution on a case-by-case basis"); *Pummill*, 2018 OK CIV APP 48, ¶ 40, 419 P.3d at 1278 (indicating that in some cases, it may be possible to answer the marketability question based on characteristics of relevant market, thus rendering individualized gas-quality assessment unnecessary)).

Plaintiff contends that, even though the Class Leases do not authorize deductions for processing, Defendants charged all royalty owners for processing that occurred. Furthermore, Plaintiff's expert, Mr. Reineke, submitted evidence, similar to the evidence in *Naylor Farms*, that Defendants here participate in the high-pressure-pipeline market because that is where the gas is sold under the gas contracts in this case. He asserts that for both percentage-of-proceeds contracts (POP/POI) and fee-based gas contracts, Defendants' proceeds were calculated based on the price received on a published index or actual sale basis at the intrastate or interstate pipeline, *after* one or more GCDTP, and that Defendants chose to participate in the downstream markets (the high-pressure transmission pipeline market for residue gas and the fractionated purity product markets for NGLs). Mr.

Reineke's report indicates that all class wells are connected to gathering systems that connect to processing plants, and Plaintiff provided the Court with the plant data. Docket No. 48, Sealed Ex. 25, pp. 1-2, 3-4 & Exs. 9-21 ("Ex. 2-J Plant Statements"). Mr. Reineke further opines (offered in rebuttal) that, without processing, none of the gas can meet the specifications for the high-pressure transmission pipeline. Docket No. 87, Sealed Ex. 2. Additionally, he asserts that all the gas in this case "was required to undergo at least one GCDTP service before it could 'reach' and be 'sold into' the pipeline market." *Naylor Farms II*, 923 F.3d at 794 ("like the gas at issue in *Pummill*").

Defendants disagree, asserting that common proof cannot be used to answer the question of marketability for over 500 wells in 17 counties and 47 different reservoirs. Although the expert testimony in *Naylor Farms* was apparently unrebutted, here, as in *Hitch*, Defendants provide opinions from experts that much of the gas is marketable at the well prior to processing. Docket No. 63, Ex. 2, 3, 5. *Compare Naylor Farms II*, 923 F.3d at 793-794 *with Hitch*, CJ-2017-01, p. 16, ¶¶ 54-56. Moreover, Defendants assert that the gas flows into different transmission pipelines, which all have different standards; as a result, gas often gets more processing than is necessary, resulting in more NGLs. Even under the IDM, lessees may deduct for such extra processing. *Naylor Farms II*, 923 F.3d at 791 ("[W]hen *marketable* gas undergoes GCDTP services to *enhance* the value of gas that is already marketable, a lessee may, under certain circumstance, allocate the cost of those services to royalty owners without breaching the IDM."). Also, at issue is whether costs for additional processing were reasonable, and Defendants contend resolution of this question is not subject to common proof. Defendants assert this is fatal to class certification

because these all require individualized determinations, and therefore provide three expert reports detailing the various markets they participate in and what processing they undertake to make it marketable.

Plaintiff replies that while the processing might be done for a margin of error, that does not mean it is an enhanced value, and there is no extra payment for excess processing. Additionally, Plaintiff asserts that, for purposes of class certification, they met their burden by producing evidence and expert opinions that the intended market for the gas in this case was the high-pressure transmission pipeline market.

The Court agrees Plaintiff met its burden for purposes of class certification. Plaintiff provides classwide evidence as to the same two factors required in *Naylor Farms II*, *Pummill*, and *Hitch*. Resolution of these issues thus remains for the trier of fact, and the Court finds that this will be done based on expert testimony, and not based on individualized testimony or testimony from any class member. As in these other cases, here "a jury could determine when the gas at issue became marketable without individually assessing the quality of that gas. Instead, a jury could make this determination based solely on expert testimony that all the gas at issue was required to undergo GCDTP services before it could be acceptable for delivery into the pipeline market." *Hitch*, CJ-2017-01, p. 21, ¶ 67; *see also Naylor Farms II*, 923 F.3d at 795 ("And in light of *Pummill* and *Whisenant*, we predict the OSC would answer that question by holding that, under the facts of this case, a jury could determine when the gas at issue became marketable without individually assessing the quality of that gas; instead, a jury could make this determination

based solely on expert testimony that all the gas at issue was required to undergo at least one GCDTP service before it could 'reach' and be 'sold into' the pipeline market.").

**Damages.**   Finally, Defendants raise the issue of damages as a barrier to class certification.   While it is true that class certification has been denied when "material differences in damages determinations will require individualized inquiries," *Roderick*, 725 F.2d at 1220, "[t]he fact that damages may have to be ascertained on an individual basis is not, standing alone, sufficient to defeat class certification.   Instead, material differences in damages determinations will only destroy predominance if those "individualized issues will overwhelm . . . questions common to the class." *Naylor Farms II,* 923 F.3d at 798 (internal quotation omitted) (citing *Menocal v. GEO Group*, 882 F.3d 905, 922 (10th Cir. 2018); *Roderick*, 725 F.3d at 1220)).

As in *Naylor Farms* and *Hitch*, here Plaintiff provides expert opinion evidence through Mr. Reineke that their "expert can determine damages on a classwide basis through use of a model" "which allocates damages back to the royalty owners in each well according to the volume and gas quality of each well." *Naylor Farms II*, 923 F.3d at 798; *Hitch*, CJ-2017-01, pp. 21-22, ¶ 68.   Defendants object, asserting that any damages calculations would be far too individualized due to the previously discussed individualized questions regarding marketability.   Defendants contend that, even if the standard of marketability is the transmission pipeline quality residue gas, the questions are still too individualized because the quality requirements for each pipeline varies.   However, Mr. Reineke states in his expert report that damages can be calculated and that he has done so in other royalty underpayment cases.   Docket No. 48, Ex. 25, pp. 5-6.   He opines that he

can either add back the royalties that were subtracted or determine the damages from volume and gas quality shown in gas analysis and plant statements, and that such calculations would be refined during the merits discovery stage. *Id.* This satisfies the requirement of classwide evidence, rather than individualized, and is sufficient for predominance. *Hill*, 2010 WL 2474051, at *6 ("The Court finds that Plaintiffs can prove liability under their various claims with the exception of their fraud claims through common proof in a single adjudication, and the liability issues predominate over individualized damage determinations which, in the circumstances of this case, could be accomplished by mathematical computations."). As in *Naylor Farms*, the Court notes here that the Court "can later divide the class into subclasses for purposes of determining damages" as necessary. *Naylor Farms II*, 923 F.3d at 798 (citing Fed. R. Civ. P. 23(c)(1)(C), (c)(5); *Roderick*, 725 F.3d at 1220). *See also* 2 Newberg and Rubenstein on Class Actions § 4:51(4) (6th ed.) ("The determination of which issues predominate should not turn on the amount of time it will take to litigate the common or individual issues. The predominance test does not involve a comparison of court time needed to adjudicate common issues weighed against time needed to dispose of individual issues.").

**Rule 23(b)(3)(A)-(D).** Returning to Rule 23(b)(3)(A)-(D), the Court finds that the parties' dispute largely centers on the first factor (Rule 23(b)(3)(A)), "the class members' interests in individually controlling the prosecution or defense of separate actions." Although the parties have some discussion of issues of collateral estoppel arising out of other cases where Cimarex is the Defendant, no party argues that those other cases are a barrier to proceeding in this one (Rule 12(b)(3)(B)), nor do they devote any time expressing

concerns as to this forum (Rule 12(b)(3)(C)).  As discussed throughout, Defendants raise numerous concerns that the issues in this case are far too individualized, making the management of this case difficult (Rule 23(b)(3)(D)), but as addressed, the Court finds those arguments unavailing.

### F.  Rule 23(b)(3) - Superiority

Courts are instructed to find whether "a class action is superior to other available methods for failure and efficiently adjudicating the controversy."  Rule 23(b)(3).  As noted above, this factor also requires consideration of the list of four nonexhaustive factors pertinent to the criteria set out in Rule 23(b)(3)(A)-(D).[9]  "It is enough that class treatment is superior because it will 'achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *CGC Holding Co. v. Broad & Cassel*, 773 F.3d 1076, 1096 (10th Cir. 2014) (quoting *Amchem*, 521 U.S. at 615).

Plaintiff asserts this requirement is met because (i) the Class Members do not have individual interests in controlling the prosecution and the inefficiency that would result, (ii) the number of putative Class Members is too large and the royalty interests too small for prosecution of individual claims, (iii) there are no obstacles to class certification, and

---

[9] "Although Rule 23(b)(3) states that these factors are pertinent to both superiority and predominance, 'most courts analyze [these factors] solely in determining whether a class suit will be a superior method of litigation.'"  *Menocal*, 882 F.3d at 915 n.3 (quoting 2 William B. Rubenstein, Newberg on Class Actions § 4:64 (5th ed., Dec. 2017 update)).  The Court has considered the four factors as to both prongs in this case, out of an abundance of caution.  *See also* Fed. R. Civ. P. 23(b) advisory committee's note to the 1966 amendment ("The court is to consider the interests of individual members of the class in controlling their own litigations and carrying them on as they see fit.").

-43-

(iv) a class action is the superior method for a fair and efficient adjudication of the controversy. "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." *Amchem*, 521 U.S. at 617 (quotation omitted). Defendants' arguments do not specifically address this prong, but are rather raised generally as to the arguments discussed above.

The Court finds that the amended proposed class meets the Rule 23(b)(3) superiority requirement. The class members, as royalty owners, would likely have little interest in controlling the prosecution or defense of separate actions, particularly given the number of putative class members and in light of the reality that the individual royalty interests are likely exponentially smaller than the cost of litigation itself. *See Amchem*, 521 U.S. at 617 ("[T]he Advisory Committee had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all.") (quotation omitted); *see also* Rule 23(b)(3)(A). Furthermore, neither party disputes the current forum for this litigation or suggests that they are already part of other litigation regarding the same controversy, and there are no problems identified by the parties that would render class action unmanageable here (Rule 23(b)(3)(B)-(D)). As such, the scale of the case, the preference for uniformity of decision, and the continuing interests of judicial economy support a finding that class certification is the superior method here. *See, e.g., Hill*, 2010 WL 2474051, at *7 ("Putative class members, each of whose royalty

interests may be quite small, would have little incentive to prosecute their claims individually because their costs would likely exceed the value of their individual claims. Thus, class treatment is a superior option here because 'the alternatives are either no recourse for thousands . . . to whom the courthouse would be out of bounds, or a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake.' . . . The superiority prong of Rule 23(b)(3) is clearly established in this case.") (quoting *Green v. Wolfe Corp.*, 406 F.2d 291, 301 (2d. Cir. 1968)).

G.  *Ascertainability*

Finally, many of Defendants' arguments relate to the question of ascertainability. "Notably, the Tenth Circuit Court of Appeals has not yet directly addressed whether, or to what extent, ascertainability is a requirement for class certification." *Smith v. LifeVantage Corp.*, 341 F.R.D. 82, 93 (D. Utah 2022).  To what extent it becomes another element of the class certification analysis is unknown, but it is clear that questions surrounding the identifiability of a class will often arise in the context of numerosity and manageability, particularly in the context of Rule 12(b)(3) with regard to relevant difficulties providing notice to class members.  *Id.* at 93 & n.75-78.

This Court has previously favored the approach set forth by the Western District of Oklahoma:  "first, that the class be defined with reference to objective criteria; and second, a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition."  *Braver v. Northstar Alarm Servs., LLC*, 329 F.R.D. 320, 334 (W.D. Okla. 2018) (cited favorably *in Cline v. Sunoco, Inc. (R&M)*, 333 F.R.D. 676, 688 (E.D. Okla. 2019)).  Here, both of those conditions appear to be met,

despite Defendants' protestations.  The leases that set forth the "universe" of this case have been identified, and it is clear which will be bound by any final judgment.  Defendants contend that ownership may not be clear from the leases, but this does not appear to be a significant problem.  *See, e.g.*, *Anderson Living Tr. v. Energen Res. Corp.*, 2020 WL 406365, at *3 (D.N.M. Jan. 24, 2020) ("The mechanics involved in finding a successive owner (and there is no reason to believe *all* owners of the 153 leases are successive owners) is not significant here, except to comment that the Court is not convinced the process would be as burdensome as Energen claims it would be.  The Court cannot help but wonder how "complicated" Energen would find it to identify a successive lease owner in order to recover an *overpayment* of royalty.").  The court can therefore ascertain the proposed class.

H.  *Determination*

In sum, the Court finds that Plaintiff satisfied its burden under Rule 23(a) and 23(b)(3) establishing this case as a class action.  Plaintiff's motion for class certification shall be granted, and the following class is certified, with the modifications to the applicable lease list as discussed above:

> All last successors in interest to royalty owners in Oklahoma wells operated by Cimarex Energy Co. of Colorado, Inc. and leased by Magnum Hunter Production, Inc. and/or Prize Energy Resources, L.P. that have produced gas or gas constituents (such as residue gas or natural gas liquids) from January 1, 2013 to present.
>
> Excluded from the Class are:  (1) agencies, departments, or instrumentalities of the United States of America; (2) Defendants, their affiliates, and employees, officers and directors; (3) Any NYSE or NASDAQ listed company (and its subsidiaries) engaged in oil and gas exploration, gathering, processing, or marketing; (4) all royalty owners to the extent they have sued any of the Defendants for underpayment of royalties from January 1, 2013 to the present before this suit was filed; (5) all royalty owners that expressly

authorized in their leases the deduction of process costs from royalties; and (6) all royalty owners to whom Defendants remitted pass-through payments on behalf of non-operating working interest owners.

## CONCLUSION

Consequently, IT IS ORDERED that the Plaintiff's Motion for Class Certification and Opening Brief in Support Thereof [Docket No. 45] is hereby GRANTED. Plaintiff's counsel of record are appointed as counsel for the class. Because the Court has determined that certification is appropriate under Fed.R.Civ.P. 23(b)(3), notice must be given to the class members. The Court therefore directs the parties to confer and submit to the Court within 28 days of the date of this order a notice to be served upon class members pursuant to Fed.R.Civ.P. 23(c)(2)(B). If the parties are unable to agree on the text of the notice, they shall jointly file Plaintiff's proposed text interlineated with Defendants' objections. Each party may also submit a separate brief in support of its position, to be filed simultaneously with the interlineated version of Plaintiff's proposed notice. Such briefs may not exceed ten (10) pages.

Furthermore, Defendants' Motion to Strike Class Allegations and Brief in Support Thereof [Docket No. 62], is hereby DENIED AS MOOT. Defendants' Motion to Strike Inadmissible Class Certification Evidence and Brief in Support [Docket No. 61], and Defendants' Motion to Strike Plaintiff's Newly Disclosed Experts M. Phyllis Bourque and William G. Foster and Brief in Support [Docket No. 91] are DENIED.

**DATED** this 8th day of November, 2023.

_____

**GERALD L. JACKSON**
**UNITED STATES MAGISTRATE JUDGE**